UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GILLANI CONSULTING INC., a Delaware corporation,<br><br>           Plaintiff,<br><br>    v.<br><br>DAEWOO HEAVY INDUSTRIES AMERICA CORPORATION (now named DOOSAN INFRACORE AMERICA CORPORATION), a New York Corporation,<br><br>           Defendant. | CASE NO. C05-0823-JCC<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

I.    **INTRODUCTION**

This matter comes before the Court on a three-day bench trial. This case involves breach of contract and copyright claims against Defendant Daewoo by Plaintiff Gillani. Gillani is the successor in interest to intellectual property which was originally owned by FourGen and licensed to Daewoo. In its original Complaint, Gillani claimed that Daewoo breached the License Agreement and infringed Gillani's copyright by using the relevant software on non-designated computers, and allowing this software to be used by a greater number of users than permitted under the License Agreement. Prior to trial, Gillani abandoned the user-count claim. Having heard all the evidence and considered the entire record herein,

ORDER – 1

the Court finds and rules as follows.

## II. FINDINGS OF FACT

### A. THE SOFTWARE AND THE EXECUTION OF THE WRITTEN CONTRACT BETWEEN DAEWOO AND FOURGEN

The software in question will be referred to simply as "the Software" for purposes of this Order. The Software runs on top of an Informix database management system, which in turn runs on top of the Unix operating system. It includes both enterprise management applications such as financial accounting, inventory, and purchasing applications. (Pretrial Order 4, Plaintiff's Alleged Facts (Dkt. No. 30).) It also contains a computer-aided software engineering ("CASE") environment for producing customized applications that adapt the Software to the customers' specific business requirements. (*Id.*) The Software is intended to be significantly customized to the needs of each individual client. (*Id.*)

As testified by Steven Crouch—the former employee of Daewoo who was responsible for purchasing and implementing the Software for many years—Daewoo was interested in the Software's marketed ability to improve the company's product distribution management and accounting capabilities.

On September 14, 1994, the parties entered into the License Agreement (Pl.'s Ex. 1) and Amendment #1 (Pl.'s Ex. 2). On December 30, 1994, Daewoo executed and sent to FourGen a "Statement of Product" to purchase additional licenses to certain software modules. (Pl.'s Ex. 3.) These documents comprise the entire written contract between the parties concerning the licensing of the Software to Daewoo.

### B. DAEWOO AND FOURGEN'S ORIGINAL WORKING RELATIONSHIP

In 1995, FourGen installed the Software at Daewoo's New Jersey Office.[1] Although the hardware was physically located in New Jersey, it was primarily accessed over a fractional T-1 line by employees working out of Daewoo's Cleveland office. As the Software was designed to be highly

---

[1] It is unclear precisely how the Software was configured with respect to its physical servers in New Jersey and whether the production and development environments were physically located on different servers. *See* discussion *infra*.

ORDER – 2

customized to Daewoo's uses, both FourGen and Daewoo spent a significant amount of time and money modifying the base code and fixing the initial technical bugs. For more than six months, commencing in the Fall of 1995, FourGen had its programmers at Daewoo's Cleveland office working on bugs and writing code. (Travel Invoices (Def.'s Ex. 4).) From the Spring of 1995 through 1996, FourGen produced approximately 2,600 bug patches for the Software.

The parties had a mutual interest in making sure that the code operated as designed. Daewoo clearly had an interest in making sure that the programs it purchased ran its business applications efficiently. FourGen had an incentive not only to help out its newest customer and ensure continued patronage from it, but also because the Daewoo installation was only the second or third installation of version 4.0 of the Software; accordingly, any improvements to the Daewoo installation could be used as a model to help improve future versions of the Software for other clients. The parties thus characterized their relationship as a mutual partnership whereby both parties could benefit from successful implementation. Correspondence between the parties in 1995 went so far as to explore the prospect of Daewoo taking on an equity position in FourGen as FourGen explored opportunities for marketing its software technology on a worldwide basis. (Jim Robb Letter (Pl.'s Ex. 33).) During this process, Daewoo—which previously had no technical support staff—began to hire a number of coders who could customize the Software and fix its technical glitches in-house. In addition, Daewoo paid the travel expenses of FourGen staff who flew out from Seattle to Daewoo's Cleveland office to work on the Software.

  C.  **THE FIRST MOVE OF THE SOFTWARE**

Near the end of 1996, Daewoo decided to move its servers from its New Jersey office to its Cleveland office. During this move, Daewoo decided to purchase a new server, an IBM 390 to run the Software which would operate on a newer version of Unix. Daewoo contacted Steve Wells at FourGen—FourGen's project manager for the Daewoo installation—regarding moving the Software to the new server to discuss what implications such an upgrade would have on Daewoo's use of the

ORDER – 3

Software. During the negotiations that ensued, FourGen offered to give Daewoo a new version of the Software, with the understanding that it would be installed on the IBM 390 computer. FourGen did not charge Daewoo any money for this new Software. As Mr. Crouch testified and as is reflected in an internal email from Mr. Crouch to Daewoo employees, FourGen representative Steve Wells orally agreed to provide Daewoo with a second license for the Software that would allow Daewoo to operate the Software on its new Cleveland server. (August 17, 1996 Email from Steven Crouch (Pl.'s Ex. 43).) FourGen did not charge additional fees for this license, but agreed to the new configuration in exchange for Daewoo providing FourGen access to Daewoo's proprietary "warranty, configuration, and material rejection programming" code. (*Id.*)

In Cleveland, the Software was installed on two servers that were to operate in concert. One server was used by Daewoo employees who accessed the Software for various business applications. This server was known as the production environment. The other server was accessed only by Daewoo programmers and FourGen programmers to make changes and modifications to the Software. This was known as the development environment. FourGen was specifically aware of this configuration, which was beneficial for Daewoo because it allowed for more efficient operation of the Software.

### D. DAEWOO AND FOURGEN LOSE CONTACT

As time went on, the Software had fewer and fewer technical bugs. Daewoo had developed its own staff of coders who could fix bugs with the Software. Fewer bug patches were needed and those problems that did arise could be fixed in-house. FourGen's programmers had left Daewoo's Cleveland office, and Daewoo's use of the Software had stabilized. By the end of 1996, FourGen and Daewoo were no longer in regular contact with each other.

In the Summer of 1998, Daewoo moved its headquarters to Suwanee, Georgia. The move included the relocation of Daewoo's Information Systems Department, including the computers on which the Software had been installed.

//

ORDER – 4

### E.    THE 1999 MEETING BETWEEN H.K. SYSTEMS AND DAEWOO

In October 1999, Daewoo attempted to contact FourGen to discuss a second move of the Software to an upgraded computer. In order to move the Software to the new computer, Daewoo needed an updated version of the CASE tools. Daewoo learned that FourGen had stopped operating under its former name and instead was operating under the name H.K. Systems. Mr. Crouch eventually identified and met with H.K. Systems Sales Representative Randy Randolph to discuss upgrading Daewoo's Servers. (October 19, 1997 Fax to Randy Randolph (Pl.'s Ex.19).)

The meeting took place at Daewoo's office in Suwanee, Georgia in October of 1999. At this meeting, Mr. Randolph apologized and informed Daewoo that H.K. Systems had moved on to version 5 of the Software and did not support version 4, which was the version Daewoo was using at the time. Further, he stated that there was no "migration path" to the new version of the Software. In layperson's terms, that meant that there was no means to move the data from an earlier version of the Software to the most recent version. As such, H.K. Systems was unable to provide Daewoo with any help in moving the Software to a new computer. Mr. Randolph did, however, offer to sell Daewoo an out-of-the-box copy of the newest version of the Software. Use of this new version would essentially entail throwing out the code that had been highly customized to Daewoo's uses at its significant expense and starting from scratch.[2] During this 1999 meeting, there was no mention of a transfer fee or a license fee in connection with the movement of the Software, despite the fact that Daewoo made it known that it was attempting to move the Software to new servers.

---

[2] Plaintiff contended at trial that the existence of a migration guide to version 5 of the Software at the time of this meeting makes it unlikely that Mr. Randolph would have said that there was no migration path. In light of Mr. Crouch's credible and specific recollection of that meeting, the Court finds that Defendant's version of the facts is accurate and that, even if the guide was in existence at the time of the meeting, Mr. Randolph either was not aware of it or failed to communicate anything reflecting his knowledge of it to Daewoo's representatives.

ORDER – 5

Believing that H.K. Systems could offer no assistance, Daewoo scoured the country for other companies that could assist it in a software move. Daewoo eventually found and purchased the necessary CASE tools from Fourth Generation Software Solutions (FGSS) located in Atlanta, Georgia. FGSS was a wholly independent company from FourGen, that acted as a value-added-reseller of FourGen CASE tools. Using the CASE tools purchased from FGSS, Daewoo moved the Software to upgraded computers in 2000, 2001, and 2004.

### F.   GILLANI'S SUCCESSION TO FOURGEN'S INTERESTS

In November 1997, FourGen changed its name to Endura Software Corporation. In February, 2000, Endura Software Corporation changed its name to H.K. Systems SCS, Inc. In June, 2000, H.K. Systems SCS, Inc. changed its name to Irista, Inc. (Pl.'s Ex. 45, (Copyright Recordations).) On January 25, 2002, Gillani acquired all intellectual property and contract rights in the Software from Irista, Inc. pursuant to an "Assignment of Intellectual Property Rights" and "Amendment 1 to the Asset Purchase Agreement," dated November 15, 2002. (*Id.*)

### G.   DAEWOO'S INTRODUCTION TO GILLANI

During March, 2004, two Gillani executives, Mark Feldman and Syed Kamal[3] visited Daewoo's offices in Suwanee. Though Gillani pitched the meeting as a way to forge a new business relationship, it quickly became apparent that a major purpose of that meeting was to seek compensation for what Gillani thought was a breach of the previous licensing agreement between FourGen and Daewoo. After assessing Daewoo's use of the Software at the time of the meeting, Mr. Syed conducted a PowerPoint presentation in which he informed the Daewoo representatives that it would cost $441,000 to bring the company back into compliance with the original licensing agreement. (Gillani Presentation (Pl.'s Ex. 5)). This figure represented back-pay for seven years of being off of license and support. Daewoo objected to any back-payments and the meeting ended without a new relationship having been established.

---

[3] Syed Kamal's given name is Kamal and his surname is Syed. Accordingly, this Order will refer to him as Mr. Syed.

ORDER – 6

1    Gillani then sent a letter on April 19, 2004, following up on the presentation and suggesting both
2    that Daewoo bring its licensing agreement into compliance, and that it also purchase the newest version
3    of the Software. (April 24, 2004 Letter From Gillani to Daewoo (Pl.'s Ex. 10).) When Daewoo did not
4    respond to that letter, Gillani sent another letter on May 28, 2004, demanding payment of
5    $3,758,265.00 within fifteen days "to bring [Daewoo's] current usage into compliance with the license
6    agreement" and threatening legal action if the demand was not met. (May 28, 2004 Letter from Gillani
7    to Daewoo (Pl.'s Ex. 11).) Tom Lattie, Daewoo's CFO, testified that, upon receipt of the May 28, 2004
8    letter from Gillani, he referred the matter to counsel. In June of 2004, Daewoo transferred the Software
9    to its present server.

10   **III.   CONCLUSIONS OF LAW**

11        **A.   BREACH OF CONTRACT CLAIM**

12   An assignee cannot acquire any rights in excess of what the assignor has the ability to transfer.
13   *Morse Elec. Prod. Corp. v. Beneficial Indus. Loan Co.*, 579 P.2d 1341, 1342 (Wash. 1978). Because
14   the assignment of intellectual property originally owned by FourGen and now assigned to Gillani is not
15   in dispute, the main issue is what rights Gillani's predecessor in interest FourGen had under the initial
16   contract and whether those rights were later waived.

17   Gillani claims that Daewoo violated its licensing agreement in two ways. First, Gillani claims that
18   Daewoo violated the Agreement by transferring the Software to new servers when Daewoo decided to
19   upgrade its hardware. Second, Gillani claims that Daewoo violated its agreement by running the
20   production and development portions of the Software on different servers.

21   Daewoo responds that the License Agreement only requires that the company have one copy of
22   the Software running at any one time. Daewoo argues that it was allowed to transfer the Software to a
23   new server, provided that it discontinued the use of the Software on the old computer. It also argues
24   that it was allowed to run the production and development portions of the Software on separate servers.
25   Daewoo argues in the alternative that, even if it did breach the technical language of the License
26   ORDER – 7

1  Agreement, FourGen and its successors in interest waived the right to enforce certain provisions of the
2  License Agreement.
3      Thus, it is important to first look at the initial contract to see what its terms were as written, and
4  then examine whether FourGen or its successors waived any of its terms after the execution of the
5  written agreement.

      **1.    TERMS OF THE ORIGINAL FOURGEN-DAEWOO CONTRACT**

    Because it involves the sale of software, the License Agreement at issue here is governed by the Uniform Commercial Code ("UCC"), which has been adopted in Washington. A software license agreement is subject to Article 2 of the UCC. *M. A. Mortenson v. Timberline Software Co.*, 998 P.2d 305 (Wash. 2000). Pursuant to the UCC, an "agreement" means "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." Wash. Rev. Code § 62A.1-201(3).

    The written agreement consists of the License Agreement (Pl.'s Ex. 1), Amendment #1 (Pl.'s Ex. 2), and the Statement of Product (Pl.'s Ex. 3). "Where contractual language is unambiguous courts will not read ambiguity into the contract." *Syrovy v. Alpine Res., Inc.*, 859 P.2d 51, 54 (Wash. 1993) (internal citations omitted). "An interpretation which gives a reasonable, fair, just and effective meaning to all manifestations of intention is preferred to an interpretation which leaves a part of such manifestations unreasonable, imprudent or meaningless." *Pub. Util. Dist. No. 1 of Lewis County v. Wash. Pub. Power Supply Sys.*, 705 P.2d 1195, 1209 (Wash. 1985). The written terms of the contract, unambiguously contemplate use of the Software on one specific piece of hardware. Any transfers of the Software to an upgraded computer—even if use on the initial computer ceased—would thus constitute a violation of this written agreement.

    This interpretation is first supported by the contract's language regarding use on a "Designated Computer." The License Agreement states: "Licensee may access the Software lawfully licenced to the Licensee on any configuration of computers or display devices connected to the Designated Computer

ORDER – 8

provided the Software is installed or executes solely on the Designated Computers(s)." (License Agreement 1.) The "Definitions" section of the Agreement defines "Designated Computer" as "*the specific Computer upon which the application software is compiled or installed and executed, and which is designated by Licensee in Appendix A attached hereto, or in a Statement of Product.*" (License Agreement 1(emphasis added).) Appendix A lists an IBM 380 as the Designated Computer. (License Agreement 9.) This specification of a specific computer clearly indicates the parties' intentions to limit use of the Software to the single IBM 380 listed in Appendix A. The Statement of Product, defining how many users lawfully could use the product, also lists the IBM 380 as the "Designated Computer" and provides a specific U.S. postal address for the location of the Designated Computer. (Statement of Product 1.) Thus, the language in the contract pertaining to the Designated Computer unambiguously indicates that only one piece of physical hardware will constitute the Designated computer, and that this computer is the IBM 380 located at Daewoo's New Jersey office at the address listed in the Statement of Product.

That the objectively manifested intent of the parties was to limit the License Agreement to one computer is further evident from the restriction on transferring the program. The agreement specifies that "[u]nless otherwise authorized by FourGen, Licensee may not install, electronically transfer, or otherwise execute the FourGen *Enterprise* Software on any Computer other than the Designated Computer." (License Agreement 1.) Daewoo's interpretation of the contract—that it was allowed to move the Software to another computer so long as there was only one copy of the Software in operation at any one time—does not make sense in light of this restriction on transferring, because it would be impossible to get the Software to a new "designated computer" without electronically transferring it.

The Agreement's obsolescence policy further bolsters this interpretation of the contract. The obsolescence clause states: "[i]n the event FourGen elects to no longer Support or produce Product Upgrades for the Software operating on a specific Computer, FourGen will offer to Users with

ORDER – 9

Software licensed on such Computers the right to transfer their licenses for the Software to a comparable Computer for a modest Transfer Fee." This provision appears to envision a world in which, if FourGen was still coming out with updates and otherwise generally supporting the Software when Daewoo wanted to upgrade its hardware, Daewoo would have to pay FourGen to facilitate the transfer. Read together with the earlier restriction preventing Daewoo from electronically transferring the Software on its own, this interpretation of the contract makes sense. Absent an obsolescence provision, Daewoo could have been left with no one who could legitimately transfer the Software to upgraded hardware in the event that FourGen ceased supporting the product. Thus, this obsolescence provision allowed Daewoo out of this potentially harsh situation by giving it the right to transfer to the Software to another computer on its own should FourGen stop supporting the product *so long as Daewoo paid a small transfer fee*. Thus, the license clearly constrained Daewoo's use of the Software to the specific IBM 380 listed as the Designated Computer and required that Daewoo either obtain FourGen's assistance in moving the Software to new hardware or pay it a small transfer fee in the event that FourGen could not provide that assistance.

It is also clear that the written terms of the License Agreement state that different parts of the Software, specifically the development and production (or "client") environments, were to be run on the same piece of physical hardware. The License Agreement states:

> The standard FourGen license fees for FourGen *CASE* Tools Software apply only when one Computer functions both as the client Computer and as the database server Computer. More specifically, no function, such as database administration, or feature, such as the database schema, of the FourGen *CASE* Tools Software may be performed or used on a Computer other than the Designated Computer. A different license fee schedule for the FourGen *CASE* Tools Software applies when the client Computer(s) is different from the database server Computer(s).

(License Agreement 1-2.) This language clearly states that the production and the development environments are to be conducted on a single computer and that additional fees or licensing would apply should different parts of the Software be installed on multiple computers.

ORDER – 10

The one exception in the written contract to the general rule that the Software could not be transferred to anything but the Designated Computer was the provision for a backup copy. The contract states that: "Licensee may make backup copies of the Software and of any portions thereof which are modified or merged with other programs in accordance with this Agreement." Thus, Daewoo had the option to make such a backup under the written contract for disaster recovery purposes. In addition to the tape backups that existed at the time the contract was entered into, this rather broad language allows Daewoo to make backup copies onto other, more modern, disaster recovery systems such as CDs, or so-called hotlive backup systems.

In short, the contract as written contains strict language prohibiting the transfer of the Software to any other computer but the IBM 380 and it also restricts the ability of the Software to have its constituent parts run on multiple computers, even if there is only one whole version of the Software running at any one time. The issue thus becomes whether FourGen or its successors in interest waived any rights it had under the written agreement through its subsequent actions.

### 2. THE PARTIES' CONDUCT AFTER EXECUTION OF THE CONTRACT

Gillani is suing for transfers that took place in 2000, 2001, and 2004 and for the configuration of the Software on different production and development servers for an unspecified period of time. Daewoo argues that Gillani's predecessors in interest "waived" the right to enforce the contract because of events that occurred prior to a hardware upgrade in 1997 and during a sales meeting in 1999. These events will be addressed chronologically.

#### i. UP TO AND INCLUDING THE 1997 TRANSFER

Gillani is not suing for the transfer that occurred in 1997.[4] Nevertheless, this transfer is relevant because Gillani's predecessors in interest were aware of, and did not object to, Daewoo's transfer of the

---

[4] It is not entirely clear what the precise date of the 1997 transfer was. It may have been late 1996 as well, but for purposes of this Order it will be referred to as the 1997 transfer.

ORDER – 11

Software to computers other than the Designated Computer and housing the production and development software on different physical servers.

Mr. Crouch testified that, prior to making the move in 1997, he obtained authorization to put the Software on the new Cleveland Server by orally obtaining a "second license." This testimony is corroborated by an email Mr. Crouch sent to several Daewoo employees on August 17, 1996, which states: "I have finished negotiations with Dickens Data and FourGen to allow us to establish a server for the Cleveland office. FourGen has agreed to provide a second license free of charge(list [*sic*] approx. $500,000), in return we will provide them with access to our warranty, configuration and material rejection programming." (Pl.'s Ex. 43.)

To be a valid modification of the original contract, the parties must follow the formalities of contract modification. Wash. Rev. Code. § 62A.2-209(3). Here, there appears to have been an offer and an acceptance by Mr. Crouch and Mr. Wells (though it is not precisely clear who made the offer and who made the acceptance). There was consideration for the modification because the "second license" was being provided in exchange for portions of Daewoo's proprietary code regarding the "warranty, configuration, and material rejection programming" functionality. Yet, under the UCC's Statute of Frauds, there must have also been a signed writing. Wash. Rev. Code. §§ 62A.2-201, 2-209(3). Here, there clearly was no such writing. Accordingly, there was no valid modification.

Under § 2-209(4) of the UCC, although an attempt at modification or rescission does not satisfy the Statute of Frauds, and thus cannot be a modification, it can operate as a waiver. Wash. Rev. Code. § 62A.2-209(4). Thus, it is important to determine what precisely FourGen waived, if anything, by its oral agreement to a "second license" and through its subsequent conduct regarding the New Jersey-to-Cleveland move.

As it is commonly stated in Washington Law, "[a] waiver is the intentional and voluntary relinquishment of a known right." *Jones v. Best*, 950 P.2d 1, 6 (Wash. 1998). The word "known" in the above definition "must be read as going only to the facts and not to their legal effect." E. Allan

ORDER – 12

Farnsworth, *Contracts* 541 n.6. (3d. ed. 1999). This seemingly simple definition is somewhat misleading, however, in that "[w]hat is involved is not the relinquishment of a right and the termination of the reciprocal duty but the excuse of the nonoccurrence of or a delay in the occurrence of a condition of a duty." *Id.* at 540-41. Thus, what is at issue here is *no*t whether Gillani's predecessors in interest *modified* the contract's terms by nullifying a particular provision of the contract. Rather the question is whether any conditional duties under the contract were waived by events that occurred after the contract was entered into.

Within the context of this case, Gillani's performance consisted of allowing Daewoo to run the Software without interference. Thus, the question is whether Gillani waived the right to interfere with Daewoo's use of the Software when Daewoo violated the License Agreement by not requiring Daewoo to obtain authorization (via purchasing the right or otherwise) prior to (1) transferring the Software to computers other than the designated computer, or (2) running the production and development versions of the Software on different servers.

The existence of a clause requiring all waivers to be in writing does not prevent Gillani from orally or otherwise waiving some of its rights through its subsequent actions. The License Agreement states:

> Any waiver, amendment, or modification of any right of the provisions of this Agreement of any right, power or remedy hereunder shall not be effective unless made in writing and signed by the parties. No failure or delay by either party in exercising any right, power or remedy with respect to any of its rights hereunder shall operate as a waiver thereof in the future.

Notwithstanding the language of this provision, FourGen or its successors in interest still had the ability later to orally waive certain conditions and be estopped from revoking such a waiver. Wash. Rev. Code § 62A.2-209(4); *see also Weber v. Briddle*, 483 P.2d 155, 159 (Wash. Ct. App. 1971) ("The mere obtaining of a nonwaiver agreement does not give the insurer a right to do anything it may wish to prejudice the rights of the insured and thereafter continue to rely upon the non-waiver agreement, since such agreement may be waived by the insurer's subsequent conduct." (*quoting* 16A J. *Appleman,*

ORDER – 13

*Insurance Law & Practice* § 9377 (Rev. ed. 1968).); *see generally* Arthur Linton Corbin, *Corbin on Contracts* § 40.13 (Joseph M. Perillo ed.) (Rev. ed. 1993 & Supp. 2006) ("At common law, an express provision in a written contract that no rescission or variation is valid unless it too is in writing will not invalidate a subsequent oral agreement to the contrary. Similarly, a provision that an express condition of a promise or promises in the contract cannot be eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective. ") Although clauses precluding oral *modifications* without a signed writing are enforceable under § 2-209 of the UCC, none of these clauses prevents a *waiver* under § 2-209(4). Wash. Rev. Code § 62A.2-209(2), (4). Accordingly, this written provision does not prevent FourGen's conduct subsequent to the execution of the contract from constituting a waiver.

With respect to the transfers to non-designated computers, while Gillani's Predecessors in interest knew about the 1997 transfer and hence waived the right to collect payment or otherwise require Daewoo to obtain authorization for that transfer, they did not know in 1997 that Daewoo would make additional transfers. As stated earlier, the party making a waiver must know of the right's factual existence for the waiver to be effective. Accordingly, knowledge of the events in 1997 and before cannot, by itself, waive the right to collect additional licenses or fees regarding these future, yet-unknown transfers.[5]

The situation is somewhat different with respect to Daewoo's knowledge regarding the configuration of the production and development servers. Here, Gillani's predecessors in interest did in fact know that the Software was configured such that it ran on two different servers and Gillani's predecessors in interest did not object to that configuration or request additional payment. It is not entirely clear whether the Software was initially installed on two separate servers. The only evidence offered at trial was Mr. Crouch's testimony that the Software was accessible in Cleveland via different access points, login names, and passwords over at T-1 line from its physical location in New Jersey.

---

[5] These subsequent transfers are analyzed separately, *infra*.

ORDER – 14

Because it is conceivable that software running on a single piece of hardware could have separate access procedures and Mr. Crouch himself never viewed the physical installation in New Jersey, it is difficult to say with certainty precisely what the physical configuration there was. What is clear is that on or before the date of the move of the physical servers from New Jersey to Ohio in 1997, the Software was configured on two different physical servers with the knowledge of FourGen. Mr. Crouch testified that, once the computers were in Cleveland, he personally witnessed that they were configured on two different servers. Daewoo representatives were working directly on the Software at Daewoo's Cleveland location and thus clearly knew of this configuration.

Accordingly, Gillani's predecessors in interest waived the right to charge for an additional license or any additional payments for this configuration by not objecting to it when the computers were set up, or within a reasonable time thereafter. Because Gillani's predecessors in interest waived the right to collect additional money in exchange for authorization to configure the computer on the two different servers—with one server operating as the production server and one server as the development server—Gillani is no longer entitled to obtain money for this dual-server configuration.

Thus, the only remaining issue is whether Daewoo must pay for the transfer of the Software to non-designated computers in 2000, 2001, and 2004.

### ii.   THE 1999 MEETING

In 1999, one of Gillani's predecessors in interests, H.K. Systems, met with a Daewoo representative and said that there was no "migration path" from the version Daewoo was using to version 5.0 of the Software. The obsolescence policy in the original contract states that "[i]n the event FourGen elects to no longer Support or produce Product Upgrades for the Software operating on a specific Computer, FourGen will offer to Users with Software licensed on such Computers the right to transfer their licenses for the Software to a comparable Computer for a modest Transfer Fee." *See* discussion *supra*. H.K. Systems' conduct in the meeting with Daewoo led to the objectively valid conclusion that H.K. Systems was no longer supporting Daewoo's implementation of the Software. This

ORDER – 15

event thus triggered the obsolescence provision, which allowed Daewoo to transfer the Software to a computer other than the Designated computer, provided that Daewoo paid a modest transfer fee.

Accordingly, the single issue remaining is whether Daewoo must pay a modest transfer fee for the 2000, 2001, and 2004 transfers.

As an alternative at this point in the analysis, the Defense also claims that Gillani's predecessors in interest "abandoned" the contract. "The parties to an express contract may abandon it and are released from their contractual obligations if the conduct of one party is inconsistent with the continued existence of the contract and that conduct is known to and acquiesced in by the other party." *Modern Builders, Inc. of Tacoma v. Manke*, 615 P.2d 1332, 1336-37 (Wash. Ct. App. 1980). Here, neither H.K. Systems nor Daewoo's conduct was inconsistent with the continuing existence of the License Agreement. Clearly, Daewoo still considered itself under a perpetual license and its use of the Software was still constrained by that license. Although specific terms of the agreement may have been waived, such conduct hardly constitutes changes from the original contract which are so extensive that the contract must be deemed to have been rescinded. *See id*; *In re Lyman's Estate*, 503 P.2d 1127, 1131 (Wash. Ct. App. 1972) ("Whether the parties have mutually abandoned a contract between them depends on their mutual intention to effect such a result. . . . [A]ll parties to the contract must Assent to its rescission and there must be a Meeting of their minds.") Accordingly, neither party abandoned the contract.

### iii. THE 2000 TRANSFER

Daewoo was able to make the 2000 transfer of the Software to new upgraded hardware after contacting FGSS, which was a value-added reseller of the Software's CASE tools. H.K. Systems was put on notice of the impending 2000 transfer in 1999. Therefore, its failure to invoke the obsolescence policy within a reasonable time after receiving notification that the Daewoo was attempting to transfer the Software to a non-designated computer means that it waived the right to collect fees for the 2000 transfer.

ORDER – 16

### iv. THE 2001 TRANSFER

A little over a year later, Daewoo transferred the Software again. Because there had been no further contact between Daewoo and Gillani's predecessors in interest since the 1999 meeting, Gillani's predecessors in interest could not have known about—and waived—its rights with respect to this transfer.

Nevertheless, estoppel may prevent a revocation of the waiver. Under section 2-209(5) of the UCC, "A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver." Wash. Rev. Code § 62A.2-209(5). With respect to the 2001 transfer, Gillani's predecessors in interest never made any retraction of any earlier waiver (i.e., the waivers regarding the 1997 and 2000 transfers). As a result, Daewoo spent significant resources moving the Software to new computers in justified reliance on Gillani's indication that it would not object to such transfers or otherwise demand payment of the transfer fee. Gillani itself only indicated it was attempting to retract the waiver several years later in 2004, well after Daewoo had justifiably relied on the continued effect of the waiver and had completed the 2001 transfer. Accordingly, Gillani is estopped from collecting even the modest transfer fee for the 2001 transfer.

### v. THE 2004 TRANSFER

Like the 2001 transfer, neither Gillani nor its predecessors in interest had knowledge that Daewoo was going to conduct this transfer and thus they cannot have waived their right to collect the modest transfer fee in the same way they waived collection as to the 1997 and 2000 transfers. Nevertheless, like the 2001 transfer, Daewoo can be estopped from revoking the waiver unless it does so in a reasonable time and such a revocation would not be unjust.

However, unlike the 2001 transfer, Gillani notified Daewoo prior to the 2004 transfer that it considered any transfers to computers other than the Designated Computer to be a violation of the

ORDER – 17

License Agreement. The first time this was made clear to Daewoo was in a letter dated April 19, 2004—approximately two months prior to the June 2004 transfer that eventually took place. Daewoo reiterated its belief that Gillani was in violation of its agreement in a follow-up letter dated May 28, 2004. These communications demand fees for Daewoo's alleged noncompliance and clearly indicate that strict performance with the written terms of the License Agreement will be required in the future. Thus, these communications operate as an attempt by Gillani to revoke the previous waiver. This attempt is effective only if it meets the conditions set forth in § 2-209(5) of the UCC. Given the close proximity in time between when Gillani notified Daewoo that it would require strict compliance with the non-transfer provision of the License Agreement and the fact that Daewoo was already in the process of moving the Software to another computer, this Court finds that the notification does not constitute "reasonable notification" under § 2-209(5) because it was given only after Daewoo had taken significant steps to prepare for the transfer.

### B. COPYRIGHT INFRINGEMENT

A copyright gives its holder certain rights as against the world, while a license agreement defines the rights between parties with regard to a particular copyright. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Here, the Court finds that the License Agreement defines the rights between Daewoo and Gillani with regard to the copyrighted Software. Accordingly, Gillani's copyright claims are limited to the terms of the License Agreement and depend on whether there was a breach thereof. The License Agreement grants Daewoo a perpetual license to use the Software. The Court finds that Daewoo's license has not been terminated and, therefore, is still in effect. Because Daewoo is still operating under a valid license and because the Court has determined that there was no breach of the License Agreement, the Court concludes that there are no grounds for a claim of copyright infringement.

//

//

ORDER – 18

### C. DAMAGES

The Court, having found that Daewoo did not breach the License Agreement and that it still holds a perpetual license, concludes that Gillani is not entitled to any contract or copyright damages.

## IV. CONCLUSION

Based upon the evidence at trial, this Court concludes that Plaintiff Gillani has failed to meet its burden of proof with regard to both the issues of liability and damages in this matter. Accordingly, judgment will be entered in favor of Defendant Daewoo Heavy Industries America Corporation on all counts of Plaintiff's complaint.

Finally, pursuant to Section 12(D) of the License Agreement, the prevailing party is entitled to attorneys' fees and costs. The Court will take briefing on the issue of attorney's fees before entering final judgment in this matter. Accordingly, Defendant is hereby directed to submit a motion for attorney's fees, along with any supporting documents. Plaintiff may object to Defendant's proposal and Defendant may later submit a reply. The Court will then consider the fees issue and enter final judgment.

SO ORDERED this 7th day of December, 2006.

John C. Coughenour
United States District Judge

ORDER – 19